UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
RONALD J. BOWER,

        Petitioner,

JAMES J. WALSH, Superintendent of
the Sullivan Correctional Facility,

        Respondent.
--------------------------------------------------------X
**TOWNES**, United States District Judge:

**MEMORANDUM & ORDER**

06-CV-4851
06-CV-5515


## INTRODUCTION

Petitioner Ronald Bower ("Bower"), who is represented by counsel in these proceedings, was convicted in state court for committing two sexual assaults, one in Nassau County and another in Queens County. He seeks a writ of habeas corpus for his Queens convictions (06-CV-4851) and his Nassau convictions (06-CV-5515) pursuant to 28 U.S.C. § 2254. His principal argument is that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to inform the defense that another individual, a police officer named Michael Perez, was arrested and prosecuted for committing two similar sexual attacks while Bower was incarcerated. The respondent has moved to dismiss the petitions as untimely under the one-year statute of limitations in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). For the reasons set forth below, the motions are granted, and the petitions are dismissed as untimely.

**FACTS**

### A. Pattern # 1/91

In 1991, members of the Queens Sex Crimes Squad ("QSCS") in the New York City Police Department ("NYPD") noticed a pattern of similar sexual assaults, beginning with an attack that occurred in June 1990. It was believed that these attacks could have been committed by the same individual due to basic similarities in the witness accounts and physical descriptions. (Pet. Exh. A, Vol. 11(a), at 105-08.) Therefore, the attacks were investigated as a pattern, referred to by the NYPD as "Pattern # 1/91." (Pet. Exh. C.) The QSCS learned that the Nassau County Police Department was also investigating attacks that appeared to fit the same pattern. (Pet. Exhs. C, M.) Bower was indicted for one such assault that occurred in Nassau County ("Incident A") and two Pattern # 1/91 attacks in Queens ("Incident B" and "Incident C"). He was tried for Incident A in Nassau County and was convicted of all crimes stemming from this incident. He was tried in Queens for Incidents B & C, but his first trial ended with a hung jury. He was retried and convicted for perpetrating Incident C, but was acquitted for Incident B.

### B. Incidents A-C

Incident A occurred on December 23, 1990 at approximately 2:00 a.m. in Nassau County, close to the Queens-Nassau border. The victim, E.E., had left a nightclub and ate breakfast at a diner located on Union Turnpike. (Pet. Exh. A, Vol. 19(c), at 303-04.) After she entered her car in the diner's parking lot and turned on an interior light, a man ran up to her, pointing a gun. (*Id.* at 305.) When she screamed, he threatened to kill her if she did not stop. (*Id.*) He forced his way into the car and began to drive away with the victim in the passenger seat. (*Id.* at 306.) During the car ride, the victim offered to give him her wallet, but he declined to take it, and said, "Shut up or I'll kill you." (*Id.*) After entering a residential area, the perpetrator began to ask the

2

woman personal questions about her name, age, and marital status. (*Id.* at 307.)

The man then parked the car and kissed E.E. on her mouth. He pulled up her dress and bra and lowered her pantyhose and panties. (*Id.* at 308.) He fondled her breast, touched her vagina with his fingers and mouth, and penetrated her vagina with his finger. (*Id.* at 309.) He asked if she liked what he was doing and forced her to perform oral sex on him for approximately five minutes before ejaculating in her mouth. She spit the semen into a tissue and threw it out of the window. He then began driving back to the diner. (*Id.* at 310.) He observed that E.E. was crying and said: "Why are you crying? I didn't hurt you. You didn't hurt me, why should I hurt you?" (*Id.*) She asked him why he attacked her and he replied: "What's the matter, don't you think you're good enough for anyone?" (*Id.*) When he reached a street in back of the diner's parking lot, he took the keys out of the ignition, wiped down the steering wheel with his sleeve, put the keys on the hood of the car, and left the scene. (*Id.* at 311.)

In a police statement, E.E. described her attacker as a white male, who was between 25 to 30 years old, approximately 5'7" tall, and had a "heavy, stocky build." (Pet. Exh. A, Vol. 15, at 62-63.) She said that the man had a full mustache and dark wavy hair. (*Id.*) She described him as wearing a grey hooded sweatshirt and a dark leather jacket. (*Id.* at 62.) At trial, she also said that the man was wearing chinos or jeans. (Pet. Exh. A, Vol. 19(c), at 312, 335). She described the gun as looking like a .38 caliber weapon that was "black or a gun metal grey, very dark." (*Id.* at 306.) She said that it had a small barrel, that she could see the chamber, and referred to it as a "Saturday night special." (*Id.* at 305-06.)

Incident B took place on January 29, 1991 at about 11:00 p.m. in the Bellerose section of Queens. Two young women, M.R. and D.B., left a pool hall, stopped at a deli on Union Turnpike, and walked to their friend's house, which was nearby. (Pet. Exh. A, Vol. 10, at 72-73,

3

147-48.) They testified that as they approached the front door, a man walked up to them, pointed a gun at M.R., and threatened to shoot her if D.B. did not go with him. (Pet. Exh. A, Vol. 10, at 74-75, 154-58.) He walked them down a driveway and forced them up against a wall below a window. (Pet. Exh. A, Vol. 10, at 76, 154-55.)

M.R. said that they did not have any money, but offered the man the jackets the women were wearing, which he did not take. (Pet. Exh. A, Vol. 10, at 76, 156.) Then he walked them out into the street and down another nearby driveway behind a home. (Pet. Exh. A, Vol. 10, at 85-88, 156-62.) While they were up against a wall, he began to fondle D.B.'s breast. (Pet. Exh. A, Vol. 10, at 91-96, 165.) He waved the gun at them and told M.R. to shut up when she spoke. (Pet. Exh. A, Vol. 10, at 95-96, 164-66.) He then fumbled around with D.B.'s belt before he left, telling them not to tell anybody, that he knew what house they were going to, and to wait five minutes before leaving. (Pet. Exh. A, Vol. 10, at 96-97, 167-68.)

M.R. testified that she told the police that the man had brown hair, brown eyes, a "round face," and a mustache. (Pet. Exh. A, Vol. 10, at 99-101.) She described him as "built" and said that he had a "bigger frame" and looked like he "worked out." (*Id.*) She said that he was about 5'6" to 5'8" tall and wore a "dark hooded sweatshirt and a light colored jacket." (Pet. Exh. A, Vol. 10, at 77.) In a police form, D.B. is described as telling the police that the man had a mustache, brown eyes, and medium length brown hair and was white, between 28 to 36 years old, and 5'7" tall. (Pet. Exh. G.) At trial, she described him as 5'6" to 5'8" tall and said that he had a "round face," a "heavy build," and a brown mustache. (*Id.*) She stated that he was wearing dark clothing, a baseball cap turned backward, and a hooded sweatshirt. (Pet. Exh. A, Vol. 10, at 171.) Both M.R. and D.B. described the gun used in the incident as "small and silver." (Pet. Exh. A, Vol. 10, at 101, 171-72.)

4

Incident C occurred at approximately 3:00 a.m. on May 7, 1991, Bower's thirtieth birthday, in a Queens pedestrian tunnel at the intersection of Union Turnpike, Austin Street, and Interborough Parkway. Two young women, J.C. and J.S., testified that they had left a local café and were walking through the tunnel when a man ran up behind them, pointing a gun at them. (Pet. Exh. A, Vol. 11(a), at 9, 16-17, 22; Pet. Exh. A, Vol. 11(b), at 236, 244.)

He ordered the women not to scream and put them up against the wall. (Pet. Exh. A, Vol. 11(a), at 23; Pet. Exh. A, Vol. 11(b), at 244-45.) He asked for money or jewelry and J.S. offered to give the man some change she had in her pocket and her watch, but he did not accept the change or the watch. (Pet. Exh. A, Vol. 11(a), at 29; Pet. Exh. A, Vol. 11(b), at 246.) He then made them sit down on the exit stairwell and forced J.S. to perform oral sex on him. (Pet. Exh. A, Vol. 11(a), at 31-32; Pet. Exh. A, Vol. 11(b), at 247.) He told J.S. that he would kill J.C. if she did not comply. (Pet. Exh. A, Vol. 11(a), at 33; Pet. Exh. A, Vol. 11(b), at 247.) After a few minutes, J.C. saw his eyes roll back and he ejaculated. (Pet. Exh. A, Vol. 11(a), at 35-36; Pet. Exh. A, Vol. 11(b), at 248.) He ordered J.S. to "swallow it" and she started crying. (Pet. Exh. A, Vol. 11(b), at 248.) He told them to wait there five minutes and threatened to return to kill them if he heard any noise. (Pet. Exh. A, Vol. 11(a), at 37; Pet. Exh. A, Vol. 11(b), at 248.)

According to a police form prepared on the date of the incident, J.C. described her attacker as having a "wandering left eye." (Pet. Exh. I.) She also said that he was between 24 to 25 years old, was 5'8" tall, weighed 150 pounds, and had a mustache, dark eyes, and wavy black hair. She described the gun as a small, silver handgun. (Id.) At the first trial, J.C. testified that the man had "a lazy left eye." (Pet. Exh. A, Vol. 4(d), at 303.) At the second trial, she described his build as "stocky." (Pet. Exh. A, Vol. 11(a), at 39.) She also said that he was wearing a black leather jacket, "acid dyed" jeans, sneakers, and gloves, which looked like "racing gloves" or

"driving gloves." (*Id.* at 25-26, 39, 44.)

A police form states that J.S. described the man as 25 years old, 5'8" tall, and weighing 160 pounds. She said that he had "brown eyes (right eye crossed)," black hair, and a mustache. (Pet. Exh. J.) The form also describes the gun as a silver revolver with a short barrel. (*Id.*) In a different police form, J.S. is reported to have said that the man was 5'10" tall and had a "good build as if he worked out." (Pet. Exh. K.)

At the second trial, J.S. testified that the perpetrator had a left eye that was "cockeyed." (Pet. Exh. A, Vol. 11(b), at 250.) She described him as "muscular," said that he was about 5'9" tall, and stated that he wore a waist-length leather jacket, faded blue jeans, black gloves, and sneakers. (*Id.* at 251, 253.) She said that the gun was "kind of black and shiny." (*Id.* at 245.) She explained that she was "not sure if it was black or silver" because there "was a reflection from the street light coming in." (*Id.*)

### Bower's Arrest & Prosecution for Incidents A-C

Sometime between May 1, 1991 and May 8, 1991, a police sketch of a man who was alleged to have raped two girls on the roof of an apartment building in Queens was published in a New York City newspaper. (Pet. Exh. N.) Detective Fogarty, the detective assigned to investigate Incident C, received two phone calls from people who said that they recognized the person depicted in the sketch. (Pet. Exh. A, Vol. 11(a), at 112-13.) One call was from Manuel Fernandez, the manager of a gym in Flushing, and the other call was from a retired Queens detective named James Smith, who was Bower's father-in-law. (*Id.*; State's Exh. 1, Vol. I, at 11-12.) Both men said that Bower looked like the man in the sketch. (Pet. Exh. A, Vol. 11(a), at 112-13; State's Exh. 1, Vol. I, at 11-12.)

Based on these telephone calls, Detective Fogarty directed a surveillance team to take a

photograph of Bower. (Pet. Exh. A, Vol. 11(a), at 114-15.) After he received the photograph, he placed it into a photo array and showed the array to the victims of Incident C. (*Id.* at 116.) J.C. picked Bower's photograph out of the photo array. (Pet. Exh. A, Vol. 11(a), at 85.) On May 10, 1991, Bower was arrested at the Douglaston Mall, where he worked as a security guard. At the time of Bower's arrest, Fogarty recovered, among other things, a blue hooded sweatshirt, a red hooded sweatshirt, a pair of jeans, and a black waist-length leather jacket. (Pet. Exh. A, Vol. 1, at 160-65; Pet. Exh. A, Vol. 19(d), at 539; Pet. Exh. Hab-1 at 6; State's Exh. 1, Vol. I, at 23; State's Exh. 1, Vol. XIII, at 222-23.)

Fogarty recorded Bower's pedigree information upon his arrest, including his date of birth (May 7, 1961), his weight (200 pounds), his height (5'10"), his eye color (brown), and his hair color (brown). (Pet. Exh. A, Vol. 11(a), at 117-18.) Bower also had a full mustache at the time of his arrest. (State's Exh. 1, Vol. XIII, at 223.)

On May 10, 1991, only three days after Incident C, Bower was placed into lineups for the alleged rooftop rape, which led to the published sketch, Incidents A-C, and at least one other Pattern # 1/91 attack. All five of the witnesses to the sexual attacks in Incidents A-C separately identified Bower as the man who attacked them. (Pet. Exhs. S, T, U, V.) The girls allegedly assaulted during the rooftop rape and a witness to another Pattern # 1/91 assault did not identify Bower. (Pet. Exhs. O and KK.) Police searched Bower's basement apartment pursuant to a search warrant and found a pair of sneakers, denim pants, and two grey pullover sweatshirts. (State's Exh. 1, Vol. I, at 16, 24, 28-30.) Fogarty subsequently met with Bower's wife, Rosemary Bower, who gave him a black starter's pistol that resembled a .38 caliber revolver. (Pet. Exh. A., Vol. 1, at 72; Pet. Exh. A, Vol. 19(d), at 527-28; State's Exh. 1, Vol. I, at 17, 25.)

Based on the positive identifications for Incidents A-C, Bower was indicted for all three

attacks. As noted above, Bower was tried and convicted in Nassau County for Incident A and received a joint trial for Incidents B & C in Queens. Bower was retried after the first Queens trial ended with a hung jury, and the jury convicted him for Incident C, but acquitted him for Incident B.

At the second Queens trial, the four complainants in Incidents B & C all testified that they had separately picked Bower out of lineups. All of them also identified Bower in court as the man who attacked them and described the incidents in detail. The victims of Incident C stated that they were in very close proximity to Bower and that there was enough light for them to see his face. (Pet. Exh. A, Vol. 11(a), at 14, 16, 17, 25, 35, 36, 38; Pet. Exh. A, Vol. 11(b), at 241-42, 250.) They also noted that there was nothing covering his face and that they saw Bower outside of the tunnel before the attack occurred. (Pet. Exh. A, Vol. 11(a), at 14, 30; Pet. Exh. A, Vol. 11(b), at 238-39, 250.) When J.S. was asked about how sure she was that Bower was the man who attacked her, she responded: "One-hundred and fifty percent." (Pet. Exh. A, Vol. 11(b), at 266.) J.C. said that there was "[n]o doubt in her mind" that Bower was the attacker and that she "would stake her life on" her identification of him. (Pet. Exh. A, Vol. 11(a), at 95-96.) Detective Fogarty testified for the prosecution. He explained the circumstances that led to Bower's arrest and testified about the identifications made by the complainants. (Pet. Exh. A, Vol. 11(a), at 101-66.)

An inmate named Steven McKay also testified on the prosecution's behalf. He stated that he met Bower in prison and offered to help Bower with his legal papers. (Pet. Exh. A, Vol. 11(a), at 181-85.) He testified that one night Bower came over to his bed, confessed to committing Incident C, and described in detail how he perpetrated the crime. (*Id.* at 188-92.) McKay said that Bower told him that he had attacked two girls and said, "I made my girl suck

my penis," while pointing a gun at the other girl. (*Id.* at 189.) He said that Bower added, "I told her if she looked, I would kill her." (*Id.*) McKay further testified that Bower told him that he forced the girl who performed oral sex on him to swallow his semen. (*Id.*)

Bower did not testify at his second Queens trial, but his ex-wife did take the stand on his behalf. She provided an alibi for Incident B, stating that Bower was locked in her apartment, where he slept on the couch for the night. (Pet. Exh. A, Vol. 11(b), at 330-39.) The defense also called a detective who showed photographs to J.C. and J.S. after Incident C. He testified that at least one of the women selected a photograph of another person before positively identifying Bower in the lineup. (Pet. Exh. A, Vol. 11(b), at 309-28.)

When asked about pictures that they selected before identifying Bower, J.C. and J.S. testified that they had only noticed similarities between the men in those photographs and the perpetrator. They said that they never positively identified anyone other than Bower as the man who attacked them. (Pet. Exh. A, Vol. 11(a), at 46-56, 83-85, 92-96; Pet. Exh. A, Vol. 11(b), at 254-66, 289-90.) In his summation, Bower's attorney argued that Bower was misidentified, claimed that McKay was not credible, and asked the Jury to return with a not guilty verdict for all of the charged crimes. (Pet. Exh. A, Vol. 11(c), at 414-36.)

The jury convicted Bower of one count of sodomy and two counts of attempted robbery for Incident C. But the jury acquitted Bower for all of the charges stemming from Incident B. (Pet. Exh. A, Vol. 11(c), at 521-24.) On August 19, 1992, the Queens trial court sentenced Bower to an indeterminate term of seven to twenty-one years for the first count (sodomy) and an indeterminate term of three to nine years for the second count (attempted robbery), both to be served concurrently. Bower was also sentenced to a consecutive indeterminate term of three to nine years for the third count (attempted robbery). (Pet. Exh. A, Vol. 14, at 23-25.) After Bower

9

was convicted in Queens, he pled guilty in Nassau County Court for Incident A.

In pleading guilty, Bower admitted under oath that, on December 23, 1990, he forced
E.E. to perform oral sex on him and that he threatened her with a "toy gun." (Pet. Exh. A, Vol.
17, at 20-22.) The following colloquy ensued on the record after Bower had been duly sworn:

> Court: Now on December 23, 1990, were you in Nassau County?
> Bower: Yes.
> Court: And did you forcibly place your penis in the mouth of the
> complainant?
> Bower: Yes.
> Court: By using forcible compulsion?
> Bower: Yes.
> Court: And did you place your finger in the vagina of the
> complainant?
> Bower: Yes.
> Court: All these acts were done with forcible compulsion?
> Bower: Yes.
> Court: Like threatening her?
> Bower: Yes.
> * * *
> Court: Mr. Bower, what did you do to the complainant?
> Bower: I put my penis in the woman's mouth. I put my mouth on
> her vagina. I put my fingers in her vagina.
> Court: And you did this by forcing her, is that correct?
> Bower: Yes.
> Court: How did you force her?
> Bower: I threatened her.
> Court: How did you threaten her?
> Bower: With a toy gun.

(*Id.*)

At the time of the plea, the court explained that the plea was conditioned on Bower
receiving a sentence of four to twelve years, which would run concurrent to the Queens sentence.
(*Id.* at 19-20.) The court cautioned Bower that it might have to reconsider that sentence after
hearing from the victim about the impact of the crime. (*Id.* at 20.) The court subsequently
determined that it could not sentence Bower to the concurrent term noted above, citing the

impact of the crime on the victim and Bower's assertions that he was innocent. (Pet. Exh. A, Vol. 18, at 2.) Bower then withdrew his guilty plea and proceeded to trial. (*Id.* at 3.)

In the Nassau trial, the victim gave her account of the crime and positively identified Bower as her attacker, as she did when she selected him from a lineup. (Pet. Exh. A, Vol. 19(c), at 302-55.) Detective Fogarty testified about the recovery of the starter's pistol from Rosemary Bower, and Nassau detectives testified about their investigation and the lineup that was conducted. (Pet. Exh. A, Vol. 19(d), at 518-29.) As in his Queens trial, Bower opted not to testify on his behalf. In a cross-examination, Bower's attorney established that Bower was the only person in the lineup wearing a hooded sweatshirt and that E.E. had told the police that the perpetrator was wearing a hooded sweatshirt when he committed the crime. (Pet. Exh. A, Vol. 19(d), at 555-65.) He argued in his summation that E.E. had mistakenly identified the wrong man, criticized the police investigation, and pointed to purported inconsistencies between E.E.'s statement and her trial testimony. (Pet. Exh. A, Vol. 19(e), at 639-73.)

The jury convicted Bower of all crimes stemming from Incident A. (Pet. Exh. A, Vol. 19(e), at 757-62.) On November 18, 1993, the Nassau trial court sentenced Bower to an indeterminate term of six to eighteen years on the first and second counts (sodomy in the first degree), both to run concurrently with each other and consecutively to the Queens sentence. The court sentenced Bower to an additional indeterminate consecutive term of two to six years on the third count (sexual abuse in the first degree). (Pet. Exh. A, Vol. 20, at 23-26.)

## C. Perez's Arrest & Prosecution for Incidents D & E

While Bower was incarcerated for Incidents A & C, a police officer named Michael Perez, who was assigned to the NYPD's Crime Prevention Division, was arrested and prosecuted in Queens for two alleged sexual assaults ("Incident D" and "Incident E"). Incident D occurred

on June 12, 1991, at about 4:30 a.m. in Rego Park, Queens. The complainant, M.P., told police that she had left work at a nightclub and went to her friend's apartment, which was located on Queens Boulevard. (Pet. Exh. Hab-6 at 39.) She was attacked in the front of the building by a man who put a gun to her head and pushed her down a stairwell. With the gun pointed at the woman's head, the man threatened her: "[G]ive me the best blow job you ever gave or I'll blow your head off." (*Id.*)

She performed oral sex on him, but he did not ejaculate. He then walked the woman to his car while holding the gun to her side and put her in the rear seat of the car. He told her to kneel down on the floor and to put her hands behind her back. (*Id.*) The man then began to scream at M.P., threatening to kill her if she did not comply with his demands, and tried to tie the woman's hands together with seatbelts. She then convinced the man to come into the building with her, saying that force was not needed and that she wanted to "be with [him]." (*Id.*) As they walked towards the entrance of the building, the man warned: "[T]here better not be anyone in your apartment or I will kill everyone." (*Id.*)

After they reached the entrance of the building, the doorman, Reginald Davis, opened the door for them. When he did this, M.P. went through the door and closed it behind her, leaving the man in the vestibule with the doorman. She screamed to the doorman, telling him that the man had raped her. The man then walked to his car and drove off. M.P. told the police that the man was white and approximately 5'5" to 5'6" tall. She said that he weighed about 150 pounds, appeared to be Italian, was about 26-28 years old, and had a medium build. She told police that he had brown eyes, "neatly combed back hair," and a "delicate face." (*Id.*) M.P. described him as wearing a tee-shirt, "stonewash" jeans, and a waist-length black leather jacket. (*Id.*) She described the man's firearm as a small, silver gun. (*Id.*)

A police report reflects that the doorman told police that he saw the complainant in a car with a white male. (Pet. Exh. Z.) Davis said that he went back to the building and opened the lobby door when the complainant and the man approached the entrance. When M.P. closed the lobby door, he heard her scream that the man had raped her. The man turned around and went to his car. Davis started to go after the man, but M.P. told him that the man had a gun, so he returned to the building to call the police. (*Id.*)

Davis described the man as a white male who was 5'6" to 5'7" tall and 26-28 years old. He said that the man had a medium build, short hair, and brown eyes. He described the man as Italian-looking and observed that he had a thick mustache and was otherwise clean shaven. He told the police that the man wore a white tee-shirt, grey "stonewash" jeans, white sneakers, and a black "biker jacket" that was "tight at the waist." (*Id.*)

Incident E, which led to Perez's arrest, took place in Flushing, Queens on August 6, 1991 at about 4:00 a.m. The complainant, Q.S., said that she was about to exit her husband's car in front of her apartment building when a man approached her, pointing a gun at her head. (Pet. Exh. Hab-7 at 80.) He told her to get back into the car and she complied. She handed him the keys after he threatened to kill her if she did not do so. He then drove the woman to a grassy area near a highway. The woman offered to give him money, but he refused to take it, telling her to sit with her hands behind her back. When he stopped the car, he ordered Q.S. into the backseat and told her to take her clothes off. He came into the backseat and, after she completely disrobed, he touched her breast and instructed her to touch his penis. When Q.S. refused to do so, he hit her in the head with his hand. She touched his penis, and he ordered her to perform oral sex on him. When she refused, he hit her in the head again. She then complied with his demand, and the man ejaculated in her mouth. The woman got a tissue from her pocketbook,

13

wiped her mouth with it, and tossed it out of the window of the car. *(Id.)*

The man directed her to put her clothes back on and to move to the front seat. Then he asked her for money and searched her bag. She said that she could retrieve money from her husband, and the man began to drive, taking her to another location, where he stopped and ordered her to take off her underwear and perform oral sex on him for a second time. Q.S. said that the man then vaginally raped her, using a condom, until he ejaculated. He cleaned himself with a tissue and threw it out of the window. The man then ordered her to put her clothes back on and drove quickly back to the complainant's home. She said that the car came to a stop after it hit something. *(Id.)*

Two officers on patrol in the area had begun following the vehicle after they noticed it at an intersection. (Pet. Exh. BB.) The driver of the car pulled over due to mechanical problems, and the officers approached the car. Q.S. then exited the car, screaming and indicating that a sexual assault had taken place. *(Id.)* Her limited knowledge of English made it difficult for her to communicate with the officers. *(Id.;* Pet. Exh. Hab-7 at 120(b), 123(b).) Abrasions that appeared to have been recently incurred were observed on Q.S.'s arms, neck, and thighs. (Pet. Exh. Hab-7 at 87, 120(b), 123(b).)

The man in the driver's seat of the car was Officer Michael Perez. Perez reportedly stated that he had consensual sex with the woman after they met and talked at a traffic light. *(Id.)* Perez was wearing blue shorts, a blue tee-shirt, black leather gloves, and a waist pack. (Pet. Exh. Hab-7 at 101, 106, 107, 108(a).) The police found a loaded .38 caliber revolver that was black in color in the car. (Pet. Exh. Hab-7 at 94, 97(a), 112, 120(b), 123(b).) Perez was thirty years old, 5'6" tall, and weighed 155 pounds. (Pet. Exhs. X, DD, EE.) Like Bower, he had a mustache, brown eyes, and dark hair. (Pet. Exh. Hab-15 at 225-26, 228-30; Pet. Exhs. X, CC, DD, EE.)

14

Perez was arrested, and his picture was put into a photo array for Incident D. The complainant in that incident, M.P., selected his picture after seeing the photo and then picked him out of a lineup. (Pet. Exhs. GG, HH.) He was also placed into lineups for two unsolved Pattern # 1/91 cases, but he was not identified by the complainants. (Pet. Exh. JJ.) Bower was put into one of the very same lineups after his arrest, and he also was not identified by the complainant. (Pet. Exh. KK.) This Pattern # 1/91 case appears to have remained unsolved.

Perez was tried separately for Incidents D & E. In the trial for Incident D, he asserted a mistaken identification defense. (State's Exh. 9 ¶ 6.) At trial, although the victim positively identified him, Davis, the doorman, said that Perez was not the man he saw on the night of the attack. (*Id.*; Pet. Exh. Hab-6 at 78(2)-(46).) The jury acquitted Perez. In the trial for Incident E, Perez put forth a consent defense and was acquitted for that incident as well. (State's Exh. 8 ¶ 7.)

In 1997, after the jury trials, Perez was placed under surveillance by the NYPD's Internal Affairs Bureau. (Pet. Exh. Hab-11 at 272, 285.) Based on the surveillance, departmental charges were brought against Perez for patronizing a prostitute in Queens on January 22, 1997 and lying about the incident at a departmental hearing. (Pet. Exh. Hab-11 at 254.) The surveillance team witnessed Perez pick up a woman and park his car. One of the officers observed the woman's head "bopping up and down in" Perez's lap. (Pet. Exh. Hab-11 at 297.)

When the woman in the car stopped, the officer saw Perez discard a tissue out of the window of the car, which was recovered by the police and contained a used condom. (*Id.* at 292, 295, 297.) The police later interviewed the woman after Perez dropped her off. The woman admitted that Perez had paid her fourteen dollars for oral sex. (*Id.* at 294, 298-99.) She also stated that Perez was uncircumcised. (*Id.* at 299(b).) Perez agreed to resign from the NYPD and avoided facing a trial over the charges. (Pet. Exh. Hab-11 at 253, 271.)

15

### D. Bower's Direct Appeals

In his Queens case, Bower appealed to the Appellate Division of the New York State Supreme Court, which affirmed the convictions on December 11, 1995. *People v. Bower*, 222 A.D.2d 516 (2d Dept. 1995). Bower then sought leave to appeal to the New York State Court of Appeals, which denied the application on March 11, 1996. *People v. Bower*, 87 N.Y.2d 1017 (1996). Bower did not file a petition for a writ of certiorari in the United States Supreme Court.

In his Nassau case, Bower appealed to the Appellate Division of the New York State Supreme Court, which affirmed the convictions on January 29, 1996. *People v. Bower*, 223 A.D.2d 719 (2d Dept. 1996). Bower then sought leave to appeal to the New York State Court of Appeals. On June 18, 1996, the Court of Appeals denied leave to appeal. *People v. Bower*, 88 N.Y.2d 933 (1996). As with the Queens petition, Bower did not file a petition for a writ of certiorari in the United States Supreme Court.

### E. The Huff/Hughes Investigation

In 1996, the chambers of a New York State Appellate Division Justice who presided over Bower's appeals began receiving phone messages from someone complaining about the Bower cases. (Pet. Exh. P ¶ 2.) The calls were reported to the Inspector General's Office of the New York State Department of Corrections. Inspector General Brian Malone assigned an investigator named Timothy Huff to look into the matter. (*Id.*) Huff met with Ronald Bower about the calls and learned that they were being made by Bower's brother. (*Id.* ¶ 3.) Bower claimed that he was innocent, prompting Huff to call the Queens Sex Crimes Squad about the case. (*Id.* ¶ 4.) He spoke to Detective Gary Tepperman of the Squad, who told Huff that he thought Bower was innocent. (*Id.* ¶ 5.)

Huff then began an investigation into whether there were facts to support Bower's claim

of innocence. (*Id.*) FBI Special Agent James Hughes, who was working in the FBI's Civil

Rights Division, aided Huff in the investigation. (Pet. Exh. PP ¶¶ 6-7.) Hughes knew Bower

from a robbery case that he had worked on. Bower had witnessed a robbery while working as a

security guard in Nassau County, and Hughes believed him to be credible. (Pet. Exh. P ¶ 6.)

During the course of their investigation, which began on May 17, 1996, Huff and Hughes learned

about Michael Perez and the crimes he was charged with. (*Id.* ¶¶ 7, 10.) After viewing pictures

of Perez, Huff concluded that Perez and Bower were "dead ringers." (*Id.* ¶ 10.) Based on their

facial resemblance and a comparison of Incidents D & E to the other incidents, he concluded that

Bower must be innocent "since in all likelihood" Perez had committed the crimes for which

Bower was convicted. (*Id.*)

Huff met with J.C. (one of the Incident C victims) and showed her a picture of Michael

Perez. She signed a statement, dated November 11, 2006, which read: "There is [a] possibility I

could have made [a] mistake having seen photo's [sic] it is possible I made [a] mistake." (Pet.

Exh. MM.) Huff attempted to speak with J.S., the other Incident C victim, but her mother would

not permit him to talk with her. (Pet. Exh. P ¶ 8.) Hughes also contacted E.E., the Incident A

victim, but she would not speak with him. (*Id.*; Pet. Exh. PP ¶ 8.) The investigation also

revealed, among other things, that Perez had nine weapons registered to him, including a nickel-

plated revolver, and that he had been off-duty during all of the Pattern # 1/91 attacks. (Pet. Exh.

P ¶¶ 14, 17.)

Huff related the results of his investigation to Inspector General Malone (Pet. Exh. P ¶

23), who met with Bower's attorney, Jeremy Goldberg, on November 21, 1996. (Pet.

Memorandum of Law (Queens) at 74.) On March 27, 1997, Huff presented his findings to Paul

Shechtman, a former director of the Department of Criminal Justice Services of the State of New

York, who had recently entered private practice. (Pet. Exh. P ¶¶ 23, 24; Pet. Memorandum of Law (Queens) at 75.) Shechtman agreed to work on the case, and Goldberg and Hughes were also present at the meeting. (Pet. Exh. P ¶ 24.)

### F. Polygraph Examination & Reinvestigation by the Queens District Attorney's Office

Shechtman arranged for a polygraph examination to be conducted by Richard Arther on December 22, 1997. (Pet. Exh. XX ¶ 3.) On that day, Arther reported to Shechtman that Bower had passed the test with no indications of deception. (*Id.* at ¶ 3; Pet. Exh. YY.) In early 1998, Shechtman asked the Queens District Attorney's Office to reinvestigate the case, expressing his "serious doubts about the verdicts." (Pet. Exh. XX ¶ 4.) The Office agreed to reexamine the case (*Id.* ¶ 5) and began its investigation on July 21, 1999. (Pet. Exh. WW ¶13.) In July 2001, the Office determined that it would not consent to the reversal of Bower's convictions. (Pet. Exh. XX ¶ 5; Pet. Exh. WW ¶ 18.) Shechtman informed the Bower family of this decision and ceased his involvement in the case. (Pet. Exh. XX ¶ 5.)

### G. Bower's Post Conviction Motions in State Court

After learning about the decision of the Queens District Attorney's Office in July 2001, Goldberg first attempted to convince officials in that office to reconsider the decision in letters sent in August 2001. (Pet. Exh. WW ¶ 20-25.) He requested meetings with these officials, hoping to avoid "a full blown adversarial affair." (*Id.* ¶ 20.) It was not until September 7, 2001 that he began drafting motions to vacate Bower's convictions pursuant to New York Criminal Procedure Law § 440.10. (*Id.* ¶ 28.) The drafts were not completed until almost two years later. (*Id.* ¶ 32; Pet. Memorandum of Law (Queens) at 75.) On August 20, 2003, Nassau Legal Aid determined that it could not continue to represent Bower because of a perceived conflict of interest, so Goldberg recruited another attorney, Bruce Menken. (Pet. Exh. WW ¶ 32.) Menken

was retained by Bower in December 2003, and the file was transferred to him on January 1, 2004. (*Id.* ¶ 34; Pet. Memorandum of Law (Queens) at 75.)

Approximately two and a half months later, on March 19, 2004, Menken filed a motion to vacate Bower's Nassau convictions under New York Criminal Procedure Law § 440.10. On March 22, 2004, he filed a motion for the same relief in Queens County. Bower argued in each motion that: (1) the prosecution violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to turn over exculpatory information about Perez; (2) the information about Perez constituted newly discovered evidence that established his innocence and required the reversal of his convictions; and (3) his convictions were procured through fraud because the newspaper sketch that led to his arrest was prepared using a picture that was provided to the police by Bower's father-in-law. In the Queens § 440.10 motion, he also asserted that Bower's conviction was procured through a misrepresentation that the prosecution was in compliance with *Brady*.

The Queens motion was denied on March 23, 2005 (Pet. Exh. Hab-1), and the Nassau motion was denied on June 20, 2005 (Pet. Exh. Hab-2). Both courts rejected Bower's *Brady* claim, held that the information about Perez was not newly discovered evidence that would warrant the reversal of his convictions, and determined that there was no evidence of fraud in connection with the newspaper sketch. Bower moved for leave to appeal in both cases. The Appellate Division denied leave to appeal in the Queens case on September 7, 2005. (Pet. Exh. Hab-9.) On October 13, 2005, the Appellate Division denied leave to appeal in the Nassau case. (Pet. Exh. Hab-10.)

*H. Bower's Habeas Petitions*

On September 7, 2006, Bower filed his habeas petition for his Queens convictions (06-CV-4851) and, on October 11, 2006, he filed his petition challenging his Nassau convictions (06-CV-5515). Bower raises the following grounds in both of the petitions: (1) he was denied his procedural and substantive due process rights by the failure to turn over exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) he was denied his procedural and substantive due process rights by the denial of his motions to vacate his convictions. In the Queens petition, he also asserts that his due process rights were violated because his convictions were procured through fraud, citing the newspaper sketch.

Bower asserts that the information about Perez's arrest and prosecution was exculpatory *Brady* material and could have been used to impeach the testimony of the witnesses who identified him, citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Bower argues that the evidence was suppressed by the state, which prejudiced him because the evidence would have created "at least a reasonable probability" of a different verdict. (Pet. Memorandum of Law (Queens) at 26.) Bower hypothesizes that the charges against him would have been dismissed before trial if the information about Perez had been made available. He concludes that the prosecutors committed "as clear a *Brady* violation as anything short of an undisclosed confession of a third party could be." (Pet. Memorandum of Law (Queens) at 26.)

Finally, Bower argues that his due process rights were violated by the state courts that denied his §440.10 petitions. He specifically refers to the Queens court's determination that the Perez evidence was not "newly discovered" under New York Criminal Procedure Law § 440.10. (Pet. Exh. Hab-1 at 14-15.) He also protests the Nassau court's determination that the evidence about Perez would not have been admissible at trial. (Pet. Exh. Hab-2 at 4-5.) Lastly, in the

Queens petition, Bower reiterated his theory about the origin of the newspaper sketch, asserting a violation of his due process rights based on the purported fraudulent conduct.

## DISCUSSION

### A. Statute of Limitations

Under AEDPA, a one-year statute of limitations applies "to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). The one-year period begins to run from the latest of the following four events:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). The limitations period is tolled during the pendency of a "properly filed" post-conviction application in state court. 28 U.S.C. § 2244(d)(2).

Bower's convictions became "final" for purposes of 28 U.S.C. § 2244(d)(1) when the deadline for filing a petition for a writ of certiorari in the United States Supreme Court expired. *See Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001). Such a petition must be filed within ninety days after the conclusion of direct review in state court. Supreme Court Rule 13(1). In Bower's Queens case, the ninety day period ended on June 9, 1996, ninety days after Bower was

denied leave to appeal to the New York State Court of Appeals on March 11, 1996.[1] In Bower's

Nassau case, the time for seeking review in the Supreme Court lapsed on September 16, 1996,

ninety days after Bower was denied leave to appeal on June 18, 1996. Therefore, Bower's

Queens convictions became final on June 10, 1996 and his Nassau convictions became final on

September 16, 1996. In this case, the statute of limitations began to run, at the latest, on March

27, 1997, when Huff communicated the results of his investigation to Bower's counsel. By that

point, both Goldberg and Shechtman were indisputably aware of the factual predicate for

Bower's claims. Goldberg had met with Inspector General Malone on November 21, 1996 about

the case, and Shechtman learned of the results of the investigation at the March 27, 1997

meeting. Accordingly, the statute of limitations began to run no later than March 27, 1997 and

expired no later than March 27, 1998 under 28 U.S.C. § 2244(d)(1)(D). Bower's habeas

petitions were not brought until more than *eight years* later in September and October of 2006.

Bower argues that his petitions are timely under 28 U.S.C. § 2244(d)(1) because he

brought them within one year of the denial of his state court § 440 motions. He asserts that this

constitutes compliance with the "letter" and "spirit" of the statute. (Pet. Memorandum of Law

(Queens) at 72.) This argument is plainly without merit because the statute of limitations lapsed

long before Bower even brought his § 440 motions. Until March 19, 2004, no state court

proceedings that could have tolled the statute of limitations under 28 U.S.C. § 2244(d)(2) were

pending. *See Artuz v. Bennett*, 531 U.S. 4, 8 (2000). Counsel's argument that the time it took

him to prepare "properly filed" post-conviction motions should be tolled is also without merit

because the toll does not take effect until such motions *have been* "properly filed" and are

---

[1] Bower had until the following day, June 10, 1996, to file a petition with the Supreme Court because June 9, 1996 was a Sunday. *See* Supreme Court Rule 30(1).

pending. *See id.*

Bower advances two other arguments in support of his contention that his petitions should not be dismissed as untimely. First, Bower contends that the doctrine of equitable tolling should apply to extend the statute of limitations period. Second, Bower asserts that the information about Perez demonstrates his actual innocence, preventing the dismissal of his petitions as time barred.

### B. Equitable Tolling

The Second Circuit has held that "'in rare and exceptional circumstances a petitioner may invoke the courts' power to equitably toll the limitations period.'" *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007) (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)). In order "'[t]o qualify for such treatment, the petitioner must establish that extraordinary circumstances prevented him from filing his petition on time, and that he acted with reasonable diligence throughout the period he seeks to toll.'" *Id.* (quoting *Doe*, 391 F.3d at 159).

Here, Bower's equitable tolling argument fails because he was not prevented from timely filing his petitions by extraordinary circumstances and did not act with reasonable diligence throughout the extensive period that he seeks to toll. Bower makes reference to the factual basis for his petitions in arguing that there were extraordinary circumstances sufficient to equitably toll the statute of limitations. However, the factual grounds for his claim are irrelevant to this analysis. The key inquiry is whether extraordinary circumstances *prevented* him from timely filing his petitions.

There were no extraordinary circumstances that prevented Bower from timely filing his habeas petition. Indeed, there is no explanation given for large portions of time that passed after Bower's counsel was made aware of the results of the Huff/Hughes investigation. After the

March 1997 meeting, no action appears to have been taken on Bower's behalf for almost nine months. There is no explanation for what occurred between March 27, 1997 and the polygraph examination that took place on December 22, 1997. There is similarly no reason given for the delay in approaching the Queens District Attorney's Office.

After learning of the new information about Perez, Bower was free to file § 440.10 motions, which would have tolled the federal statute of limitations. The pendency of the reinvestigation by the Queens District Attorney's Office posed no barrier to a timely filing. Bower argues that this period should be tolled because he believed in good faith that the District Attorney would agree to a reversal of his convictions. However, Bower's counsel freely concedes that this result was never guaranteed. He does not claim that he was lulled into inaction by a promise that the District Attorney's Office would consent to a reversal.

There is simply no reason why Bower could not have filed motions to vacate, tolling the statute of limitations, and urged the District Attorney to reinvestigate the matter during the pendency of the motions. Bower's attorney acknowledges this option, but says that his decision to delay the filing of the motions to vacate was a strategic decision. (Pet. Memorandum of Law (Queens) at 79-80.) Having specifically chosen to pursue a reinvestigation by the District Attorney's Office *in lieu of* timely commencing the proper proceedings, Bower cannot now avoid the impact of AEDPA's statute of limitations.

Bower's attorney also claims that the approximately two year period it took him to finish drafts of the § 440.10 motions, the delay caused by the need to retain Menken, and the time it took Menken to file the motions, should also be equitably tolled. He attributes the delay in completing his initial draft to his other responsibilities at Legal Aid and the limited resources of his office. However, the statute of limitations cannot be individually tailored to an attorney's

24

workload in a given case through the doctrine of equitable tolling. In fact, even a petitioner's "*pro se* status does not in itself constitute an extraordinary circumstance meriting tolling." *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004); *see also Ayala v. Miller*, No. 03 CV 3289, 2004 WL 2126966, at *2 (E.D.N.Y. Sept. 24, 2004) ("Neither a prisoner's pro se status, nor his lack of legal expertise, provides a basis for equitable tolling of AEDPA's statute of limitations.").

It took Bower almost one year from the resolution of his § 440.10 motions to file his habeas petitions. Therefore, for his petitions to be timely, almost the entire period from the discovery of the factual basis for the petitions to the filing of the § 440.10 motions would have to be tolled. Bower did not act with reasonable diligence throughout this protracted period of delay, and at no time was he prevented from timely filing due to extraordinary circumstances. Accordingly, the doctrine of equitable tolling does not render the instant petitions timely under the applicable statute of limitations.

## C. Actual Innocence

Bower alleges that his untimely petitions should be reviewed on the merits because the information about Perez establishes that he is actually innocent. The Second Circuit has not yet ruled on the issue of whether there is a "gateway" actual innocence exception to AEDPA's statute of limitations. *Whitley v. Senkowski*, 317 F.3d 223, 225 (2d Cir. 2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000). Nevertheless, it has instructed district courts to consider the following questions when they are confronted with an actual innocence claim:

> (1) Did [the petitioner] pursue his actual innocence claim with reasonable diligence? (2) If [the petitioner] did not pursue the claim with reasonable diligence, must an actual innocence claim be pursued with reasonable diligence in order to raise the issue of whether the United States Constitution requires an "actual

25

innocence" exception to the AEDPA statute of limitations? (3) If [the petitioner] did pursue the claim with reasonable diligence or if reasonable diligence is unnecessary, does [the petitioner] make a credible claim of actual innocence? (4) If [the petitioner] does make a credible claim of actual innocence, does the United States Constitution require an "actual innocence" exception to the AEDPA statute of limitations on federal habeas petitions?

*Whitley v. Senkowski*, 317 F.3d 223, 225-26 (2d Cir. 2003). The Second Circuit has further

directed district courts to address the issue of whether "the petitioner has presented a credible

claim of actual innocence before ruling on the legal issues of whether such a showing provides a

basis for equitable tolling and whether the petitioner must also demonstrate that he or she

pursued his or her claim with reasonable diligence." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir.

2004). In light of these instructions, district courts confronted with actual innocence claims have

examined the credibility of those claims at the outset of the analysis. Where they have

determined that the actual innocence claims fail on the merits, they have rejected the claims

without deciding whether the Constitution requires an actual innocence exception, or whether

reasonable diligence is required. *See Velez v. Walsh*, 07-CV-1037, 2010 WL 519816, at *2

(E.D.N.Y. Feb. 9, 2010); *Taylor v. Cuomo*, No. 07-CV-2138, 2007 WL 3540351, at *3 n.5

(E.D.N.Y. Nov. 14, 2007).

### *1. The Actual Innocence Standard*

In order to establish a credible claim of actual innocence, a "petitioner must support his

claim 'with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence-that was not presented at trial.'" *Doe*, 391 F.3d

at 161 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). In assessing whether new evidence is

"reliable," as the Second Circuit explained in *Doe*, "the habeas court must determine whether the

new evidence is trustworthy by considering it both on its own merits and, where appropriate, in

light of the pre-existing evidence in the record." *Doe*, 391 F.3d at 161. Moreover, a court must "consider a petitioner's claim in light of the evidence in the record as a whole, including evidence that might have been inadmissible at trial." *Id.* at 162. This is because "[a]ctual innocence requires 'not legal innocence but factual innocence.'" *Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007) (quoting *Doe*, 391 F.3d at 162).

A petitioner can only "invoke the actual innocence gateway and obtain review of the merits of his claims" if the Court determines that "in light of all the evidence, it is 'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Doe*, 391 F.3d at 162 (quoting *Schlup*, 513 U.S. at 327). With regard to the application of this standard, the Second Circuit has explained:

> [T]he court must consider how reasonable jurors, fairly examining all of the evidence presented, would assess the petitioner's guilt or innocence. In evaluating the record as a whole, the habeas court may make its own credibility determinations as to both the new evidence and the evidence already in the record that may be thrown into doubt by the new material. With respect to the ultimate issue of innocence, however, *Schlup* does not permit the court to make an independent judgment of whether reasonable doubt exists, but instead requires a probabilistic determination about what reasonable, properly instructed jurors would do. This probabilistic analysis must determine not merely whether a reasonable doubt exists in the light of the new evidence, but rather whether it is more likely than not that no reasonable juror would have found the defendant guilty.

*Id.* at 163 (internal citations omitted).

## 2. The Credibility of Bower's Actual Innocence Claim

Bower has not asserted a credible actual innocence claim because he has not presented new reliable evidence that demonstrates that it is "more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. Bower's

mistaken identification theory is premised on his claim that Perez is the true perpetrator of the crimes for which he was convicted. However, his assertion that Perez committed these crimes is not based on any direct evidence that ties Perez to them. He claims that Perez is guilty of Incidents D & E and then relies on a comparison of Incidents D & E to the other incidents to conclude that Perez must have been the person involved in all of the incidents. There are two key problems with this approach: (1) the similarities that exist among the incidents are overshadowed by key differences and direct evidence that Bower was the perpetrator; and (2) Perez was *acquitted* of all charges stemming from Incidents D & E. Bower essentially asks the Court to exonerate him of crimes for which he was convicted, without regard to the direct evidence linking him to those crimes, and to implicate Perez based purely on speculation, notwithstanding his acquittals. For the reasons stated below, Bower cannot pass through the actual innocence "gateway" because he has not presented a credible claim of actual innocence.

### (a) Similarities & Differences among the Incidents

Bower concludes that a single perpetrator must have committed the crimes for which he was convicted because of the similarities that are evident upon a comparison of Incidents D & E to the other incidents. To be sure, the accounts and descriptions of the complainants were similar. In all of the incidents, the complainants reported being attacked by an armed perpetrator at night after frequenting a club or other nighttime establishment. But while Bower focuses on these basic similarities, he virtually ignores significant differences which undercut his theory. The evidence does not establish that, as Bower contends, these crimes must have been committed by a single perpetrator, Michael Perez. The similarities and differences among the incidents will be discussed in the following categories: (i) Physical Traits; (ii) Clothing & Gun Descriptions; (iii) Modus Operandi; and (iv) Temporal & Geographic Proximity.

### (i) Physical Traits

It is true that the complainants generally described a man who was within the same age range and who had a similar height and weight. Bower argues that these descriptions point to a single perpetrator and claims that Perez must have been responsible for all of the incidents. Bower claims that Perez better fit the descriptions and that Bower was misidentified due to the facial resemblance between the two men.

The broad descriptions given by the complainants in these incidents do not show that a single person necessarily committed all of them. They are of a general nature and described a broad swath of the population. While Bower insists that Perez better fit the descriptions, they can reasonably be viewed as describing both men. Bower points to the fact that the estimates of the perpetrator's weight by the complainants were closer to Perez's weight than to his weight. However, weight can be difficult to estimate after a relatively brief encounter. Moreover, an important difference in the descriptions is that the victims of Incidents A & C described a "heavy," "stocky," and "muscular" build, which appears to better comport with Bower's appearance. (Pet. Exh. A, Vol. 11(a), at 39; Pet. Exh. A, Vol. 11(b), at 251; Pet. Exh. A, Vol. 15, at 62-63.) In contrast, the witnesses to Incident D described a medium build, which indicates that the complainant in that incident may have been describing a different perpetrator.

Although there is some degree of facial resemblance between Bower and Perez, even a cursory review of their photographs indicates that they have different facial features. Inspector Huff's conclusion that Bower and Perez were "dead ringers" is inaccurate. (Pet. Exh. P ¶ 10.) Nor did they look like "identical twins," as Bower's counsel suggests. (Pet. Memorandum of Law (Queens) at 54.) Additionally, as noted, Bower had a heavier build than Perez, further distinguishing them from each other.

While Bower focuses on the general similarities in the witness descriptions and his facial resemblance to Perez, he fails to seriously address the fact that there are two unique physical traits that have been identified by the complainants in Incidents A & C, traits that have not been linked to Perez, but have been attributed to Bower.

### Eye Abnormality

Significantly, both victims in Incident C described their assailant as having a unique eye abnormality, a condition that Bower indisputably has. Numerous people have attested to the fact that Bower has this condition. To the contrary, people who have observed Perez have stated that he has no such abnormality. Bower's ex-wife, who testified on his behalf in the Queens trial, has affirmed under oath that he had a "'lazy,' or crooked, left eye." (State's Exh. 4 at ¶ 5.) Bower's own trial attorney in the Queens case stated that the abnormality was "quite apparent." (Memorandum of Law in Support of Motion to Suppress at 11-13.) Indeed, Bower himself admitted that he has a "lazy eye" and that his eyes are "messed up from 6 operations." (Pet. Exh. Hab-11 at 328L.) Even Bruce Menken, who represented Bower in connection with his § 440.10 motions, conceded that he had "somewhat of a wandering eye." (Pet. Exh. Hab-3, Vol. I., ¶ 23.)

In support of the instant petitions, Bower's attorney now claims, although he has never seen Bower in person, that the condition was "corrected surgically" during childhood. (Pet. Mem. of Law at 38, 40.) But he also states that Bower's trial counsel in Queens told him that a "'wandering' tendency of one eye would become detectable when [Bower] was under significant stress." (Pet. Memorandum of Law (Queens) at 40.) The bald assertion that the condition was "corrected" by someone who has never seen Bower cannot be credited in light of the statements made by people who personally observed him.

In addition to submitting evidence to show that Bower has the unique eye abnormality

noticed by the victims in Incident C, the respondent has also produced proof that Perez did not have such a condition.  First, Perez's former partner avers that Perez "did not have a 'wandering,' or 'lazy' eye" and that his eyes "were not crooked or misaligned." (State's Exh. 12 ¶ 6.)  Sergeant Philip Reese, who arrested Perez and investigated Incidents D & E, asserts that he "had face-to-face conversations with Perez and had other opportunities to see his face." (State's Exh. 13 ¶ 3.)  He affirms that Perez did not have a "'wandering' or 'lazy' eye" and that his eyes were not "crooked or misaligned." (*Id.*)  Two Nassau County detectives who visited Perez to "observe his eyes" and "determine if Perez had a droopy eye, or a lazy eye" stated that "his eyes appeared to be normal." (State's Exh. 15 ¶¶ 2, 4; State's Exh. 16 ¶¶ 2, 4.)  They added that they "noticed no droopy eye, no lazy eye, [and] no 'cock-eyed' appearance." (State's Exh. 15 ¶ 4; State's Exh. 16 ¶ 4.)  Finally, the prosecutors who handled the trials for Incidents D & E have both stated that they did not remember Perez as having a "lazy, or crooked, eye." (State's Exh. 8 ¶ 8; State's Exh. 9 ¶ 6.)

It is also significant that the complainant in Incident E did not note that Perez had any eye condition even though she described his "big eyes." (Pet. Exh. Hab-7 at 81(b).)  Also, the complainant in Incident D, which Bower attributes to Perez, described the assailant's "pretty eye lashes," but made no mention of any eye irregularity. (Pet. Exh. Hab-6 at 44(c).)  Bower attempts to manufacture confusion on the issue of whether Perez had an eye condition by submitting a still photograph of Perez.  He claims that the photograph shows that "one eye seems to have a gaze slightly at an angle from the other." (Pet. Memorandum of Law (Queens) at 41.)  However, no eye abnormality whatsoever is evident from this photograph.  The persuasive evidence that Bower had the same unique eye condition that was described by the Incident C victims strongly points to Bower as the perpetrator of that incident.  Conversely, the evidence that Perez did not

have such a condition exculpates him for that crime.

### *Circumcision*

Another key physical difference is that Bower was circumcised at the time of the attacks, while evidence shows that Perez was not. Both of the victims who were forced to perform oral sex on their attackers in Incidents A & C have submitted affidavits in which they state under oath that their assailant was circumcised. (State's Exh. 2 ¶ 2; State's Exh. 17 ¶ 10.) Bower does not dispute that he was circumcised, and this fact is confirmed by his ex-wife. (State's Exh. 4 ¶ 5.) There is also evidence that Perez was uncircumcised. As noted, a police report, which the Court finds sufficiently reliable to be considered on these petitions, recounts that a prostitute interviewed in connection with the departmental charges against Perez specifically stated that Perez was uncircumcised. (Pet. Exh. Hab-11 at 299(b).) This key physical difference between the two men, like Bower's eye abnormality, inculpates Bower and exculpates Perez.

This important difference is glossed over by Bower, who suggests that the victims who observed the perpetrator's penis while being forced to perform oral sex on him may have been mistaken as to whether the man was circumcised. Bower relies on an affidavit from a urologist, who claims that "an erect circumcised penis and an erect uncircumcised penis are physically indistinguishable." (Pet. Exh. Hab-3, Vol. II, ¶ 4.) This affidavit, by a doctor who has never examined Bower or Perez, is insufficient to cast doubt on this issue given the statements of the victims. The physical similarities that Bower and Perez share and the common features identified in the witness descriptions for Incidents A & C and D & F are outweighed by the unique physical traits discussed above, which the two men do not have in common.

32

### (ii) Clothing & Gun Descriptions

The clothing descriptions were similar with witnesses generally describing the assailant as wearing jeans, sneakers, and a leather jacket or a hooded sweatshirt. In Incident A, E.E. described the perpetrator as wearing both a hooded sweatshirt and a leather jacket. All of the complainants described the weapon as a small handgun, although some said it was silver and others described it as black. Perez was arrested at the scene of Incident E while wearing a tee-shirt and shorts. But the waist-length leather jacket, hooded sweatshirts, jeans, denim pants, and sneakers that were recovered from Bower better comport with the witness descriptions. Bower places great weight on the fact that Perez wore a pair of black driving gloves in Incident E because the perpetrator in Incident C wore gloves as well. However, the wearing of gloves by a rapist is not a particularly unique occurrence. Gloves are often used to prevent the police from recovering fingerprints. Moreover, Bower was also known to wear weightlifting gloves. (State's Exh. 3 ¶ 8.) Overall, the clothing evidence inculpates Bower more than Perez.

Bower had access to a black starter's pistol that looked like a .38 caliber revolver. Perez had a black .38 caliber handgun during Incident E and also owned a silver .38 caliber handgun. (Pet. Exh. Hab-7 at 97(a), 105, 112.) E.E. described the gun as black or "gun metal grey" and J.C. said the gun pointed at her was silver. (Pet. Exh. A, Vol. 19(c), at 306.) J.S. was not sure whether it was black or silver. Perez's ownership of a relatively common type of gun in two ordinary colors is of little probative value, especially considering the fact that Bower had access to a gun that could have been used to perpetrate the crimes for which he was convicted.

### (iii) Modus Operandi

The incidents do not share a specific modus operandi that is so unique that one person must have been involved in all of them. As Justice Grosso remarked in his decision denying

Bower's § 440.10 motion in the Queens case: "There is nothing readily distinguishable in a gunpoint sexual assault." (Pet. Exh. Hab-1 at 18.) Each of the incidents reportedly involved such an assault, but they were carried out in different ways.

Q.S., the complainant in Incident E, described a sexual attack that was significantly different from the other incidents. First, Q.S. is the only woman who reported that she was hit in the head by her attacker. None of the other women said that they were struck. Second, the other incidents were relatively brief encounters that involved no more than one completed act of forced oral sex. In Incident E, Q.S. said she was forced to perform oral sex on Perez for a second time after he ejaculated. She also claimed that Perez forced her to engage in full sexual intercourse using a condom. None of the other incidents involved full sexual intercourse, and condoms were not used in any of the other incidents. Third, the complainant in Incident E completely disrobed after she said Perez told her to take off all of her clothes. None of the other complainants were forced to remove all of their clothing. Finally, Incident E involved sexual activity at multiple locations. According to the victim, Perez forced her to perform oral sex near a highway before driving somewhere else, where he sexually assaulted her again. This sets Incident E apart from Incidents A & C, where the victims were sexually assaulted at one location.

Bower stresses that Incidents A & E are similar because both complainants reported a gun point assault that occurred in their own cars. However, this basic similarity is overshadowed by the differences mentioned above. Overall, the complainant in Incident E described a more violent and aggressive attack than was described by the complainants in the other incidents. The heightened level of violence in Incident E is in stark contrast to the account of the perpetrator's actions in Incident A. As noted above, the man reportedly asked the woman why she was crying and said that he was not going to hurt her.

Contrary to Bower's argument, the common method of semen disposal in Incidents A & E is not probative of the alleged assailant's identity. Bower claims that this shows that the same man was involved in both incidents. But there is nothing in the record to suggest that the women were instructed to use this method of disposal. Their actions would only bear on the issue of the identity of the alleged assailant if they acted at his direction in both cases. Absent such a connection, their actions do not point to a single perpetrator.

The complainant's account of Incident D also sets it apart from other incidents in several important respects. First, Incident D is the only incident where the complainant reported an attempt to physically restrain her by tying her hands. In both Incidents A & C, no attempt was made to immobilize the victims. The closest connection to any of the incidents is to Incident E, where Perez allegedly instructed Q.S. to place her hands behind her back, although she did not describe an attempt to tie them. This undercuts Bower's argument because it sets Incidents D & E apart from the incidents that he was charged with perpetrating.

Second, Incident D is also unique in that the complainant said that she was taken into the perpetrator's car. All of the other incidents occurred either outdoors or in cars belonging to the complainants. Lastly, the complainant in Incident D described a more graphic and violent verbal threat than was used in the other incidents. While the other complainants reported that the man said that he would kill them if they did not comply, the complainant in Incident D said that the man threatened to "blow [her] head off" if she did not give him the "best blow job." (Pet. Exh. Hab-6 at 39.) This language was not used in Incident C and is not consistent with the verbal communication initiated by the perpetrator of Incident A. As noted, he asked her personal questions, asked her why she was crying, and said that he would not hurt her.

### *(iv) Temporal & Geographic Proximity*

Bower stresses that the incidents occurred close enough to each other and in a short enough time period to show that they must have been committed by the same person. However, none of the incidents took place in the same neighborhood or immediate area. Incident A occurred in Nassau County while the others took place in various neighborhoods in Queens. While Incident D took place in an area that is close to Incident C, Incident E occurred in Flushing, far from the location of the other incidents. The only specific geographical connection is between Incidents A-C. These incidents all took place near the same major thoroughfare, Union Turnpike. However, this only weakens Bower's argument because it distinguishes the incidents that he was charged with from the incidents that occurred while he was incarcerated.

Further, Incidents A-E occurred over an approximately eight month time period, and no one incident occurred within a month of another incident. The closest time period between any of the incidents was between Incident C and Incident D, which occurred just over a month apart. There was an approximately three and a half month gap between Incident B and Incident C and an almost two month time period between Incident A and Incident B. Contrary to Bower's assertions, the incidents did not occur so close in time and space as to demonstrate that a single person was involved in all of them.

### *(b) Direct Evidence Implicating Bower*

It cannot be gainsaid that Bower was separately and independently identified by all three witnesses to Incidents A & C as the man who attacked them. Perez was never positively identified by any of these victims and never admitted involvement in these incidents. All three victims who picked Bower out of lineups and identified him in court noted that there was nothing covering Bower's face, that there was sufficient light for them to see his face, and that they were

36

in close proximity to him for more than ten minutes. J.S. testified that she was "[o]ne hundred and fifty percent" sure that Bower was the man who attacked her. (Pet. Exh. A, Vol. 11(b), at 266.) J.C. said that there was "[n]o doubt in her mind" that Bower was the attacker and that she "would stake her life on" her identification of him. (Pet. Exh. A, Vol. 11(a), at 95-96.)

E.E. and J.S. specifically reaffirmed their identifications of Bower in affidavits in opposition to his § 440.10 motions. (State's Exh. 2 ¶ 1; State's Exh. 17 ¶ 1.) Bower points to J.C.'s unsworn statement to Inspector Huff that she could have been mistaken when she identified Bower. (Pet. Exh. MM.) However, in a 2004 interview, J.C. stated that Huff affirmatively told her that she had misidentified Bower and that the real perpetrator was a "look-a-like" at the beginning of her meeting with him. (State's Exh. 11 ¶ 4.) She further asserted that she was confident that she had correctly identified Bower as the perpetrator at the lineup and in the two Queens trials. (*Id.* ¶ 7.)

J.C.'s equivocation in 1996 about her earlier identifications of Bower is unreliable and of little probative weight for several reasons. First, her 1996 statement was made over five years after the date of the assault, while the lineup at which she selected Bower occurred only three days after the attack. Second, J.C.'s 2004 description of the interview raises doubt about whether the presentation of the photo array was suggestive. Third, J.C. never actually identified Perez as the perpetrator, but only indicated the possibility of a mistake. In fact, the only person that J.C. ever positively identified as the man responsible for Incident C is Bower.

Significantly, the evidence against Bower in his second Queens trial was not limited to witness identifications. His convictions in that case were also supported by evidence that he himself confessed to the crime. This served to corroborate the two witness identifications and is powerful evidence of Bower's guilt. Bower asserts that McKay was lying, but Bower's

37

argument is belied by McKay's knowledge of key details about how the crime was perpetrated. Bower refers to an affidavit from another prison inmate, who called McKay a "chronic liar." (Pet. Memorandum of Law (Queens) at 45.) According to this inmate, who was not permitted to testify at Bower's second trial, it is his "opinion" that McKay "was running a scheme" to elicit enough details about the crime from Bower to persuade the prosecutor that Bower had confessed. (*Id.*) This inmate's opinion about McKay's motivation is insufficient to undermine McKay's trial testimony.

With respect to Incident A, Bower admitted under oath that he was the perpetrator of that crime when he pled guilty before the trial court. Bower argues that his guilty plea cannot be used against him in any way because it was withdrawn. The Second Circuit has held that a habeas court can consider a guilty plea in the context of making an actual innocence determination. *Doe v. Menefee*, 391 F.3d 147, 168-69 (2d Cir. 2004); *Rosario v. U.S.*, 164 F.3d 729, 734 (2d Cir. 1998). As noted above, Bower withdrew his plea when the trial court informed him that the court could not sentence him to a concurrent sentence due to his "continued denial" of responsibility for the crime and the impact of the crime on the victim. (Pet. Exh. A, Vol. 18, at 2.)

Although the statements made at his plea allocution could not be used against him at trial, the fact that he admitted perpetrating the crime under oath can be considered in connection with his present claim that he is actually innocent. His plea admission is corroborated by the positive identification by the victim. Further, his statement that he used a "toy gun" to perpetrate the crime is consistent with the theory that he utilized the starter's pistol recovered from his ex-wife to commit the crime. (Pet. Exh. A, Vol. 17, at 22.)

While Bower maintains that he only pled guilty and admitted to the crime to receive a

concurrent sentence, as in *Doe*, in light of the evidence in the record, the petitioner has not established "that he lied under oath at his guilty plea." 391 F.3d at 169. Therefore, Bower's guilty plea has been taken into consideration, but even if it was not part of the analysis, the Court would still hold that Bower has not set forth a credible claim of actual innocence.

### (c) Other Evidence

Bower's reliance on his polygraph examination is without merit. A polygraph test is not reliable evidence of actual innocence. *See Burch v. Millas*, 663 F. Supp. 2d 151, 195-96. (W.D.N.Y. 2009). The Supreme Court has explained that "there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." *United States v. Scheffer*, 523 U.S. 303, 309-10 (1998).

Bower urges the Court to credit the opinions of law enforcement personnel who believe that Bower did not commit the crimes for which he was convicted. However, the opinions that Huff, Hughes, and Tepperman have formed do not constitute new reliable evidence which can be considered under the actual innocence standard. This Court is charged with examining the factual evidence before it, and the opinions and interpretations of others should not be considered. Bower's claim that Detective Fogarty, who is now deceased, expressed doubts about his guilt is also not entitled to consideration. The hearsay accounts of Detective Fogarty's statements are unreliable, and there is no indication of the factual basis for his purported opinion.

### Summary

The instant petitions must be dismissed as untimely because Bower has not set forth a credible claim of actual innocence. The fatal flaw in his argument is that he offers no direct evidence pointing to any other person's involvement in the crimes for which he was convicted.

His misidentification theory is premised on the similarities that exist among the incidents. But these similarities are overshadowed by substantial differences and the direct evidence of Bower's guilt. Finally, Bower glosses over key differences, which actually exculpate Perez and inculpate Bower. Speculation that another person committed crimes for which a petitioner was convicted is insufficient to establish innocence, especially in light of evidence to the contrary.

Bower heavily relies on *House v. Bell*, 547 U.S. 518 (2006) to support his contention that he has made a showing of actual innocence. In that case, the Supreme Court held that the petitioner had met the actual innocence standard by presenting scientific evidence that raised doubts about physical evidence that was used to convict him and by directly linking another person to the crime. *Id.* at 540-54. Scientific evidence was submitted to show that blood found on the petitioner's pants was contaminated, and it was revealed that semen found on the victim's clothing matched the DNA of her husband. *Id.* at 540-48. The petitioner also presented evidence that directly implicated the victim's husband as his wife's murderer. *Id.* at 548-53. There was evidence that he had physically abused her in the past, that the victim wanted to leave him, that he had attempted to manufacture a false alibi, and that he admitted to others that he had killed her. *Id.*

*House* is clearly distinguishable from the instant cases. First, there is no new scientific evidence that raises doubts about any of the evidence used to convict Bower. Second, there is no direct evidence that points to anyone other than Bower. Third, certain evidence actually exculpates Perez, the man Bower claims to be the true perpetrator of the crimes. The Court holds that Bower has not presented new reliable evidence that demonstrates that "in light of all the evidence, it is 'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Doe v. Menefee*, 391 F.3d 147, 162 (2d Cir. 2004) (quoting

*Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Accordingly, Bower has not set forth a credible claim of actual innocence.

In light of this determination, the Court need not address the issue of whether reasonable diligence is required in order to pass through the actual innocence "gateway." *Doe*, 391 F.3d at 161. Nor must the court reach the issue of whether the Constitution requires an actual innocence exception. *Doe*, 391 F.3d at 160-61, 173-74; *Whitley v. Senkowski*, 317 F.3d 223, 225-26 (2d Cir. 2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000). Two Circuit Courts of Appeals have held that reasonable diligence is a prerequisite for an actual innocence claim. *See Gildon v. Bowen*, 384 F.3d 883, 887 (7th Cir. 2004); *Flanders v. Graves*, 299 F.3d 974, 977-78 (8th Cir. 2002). At least one district court in the Second Circuit has followed this approach. *See Whitley v. Senkowski*, 567 F. Supp. 2d 490, 495-96 (S.D.N.Y. 2008). If a petitioner is required to exercise reasonable diligence, then Bower's actual innocence claim would fail even if he could establish a credible claim of actual innocence. As detailed above, Bower woefully failed to act with reasonable diligence after learning of the information about Perez.

## CONCLUSION

Based on the foregoing, the respondent's motions to dismiss are granted, and the petitions are dismissed with prejudice. The Court also declines to issue a certificate of appealability because the petitioner has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

**SO ORDERED**.

s/ SLT
SANDRA L. TOWNES
United States District Judge

Dated:     March 31, 2010
            Brooklyn, New York